## M. J. FARRIS V. A. R. HENDERSON.

### [*Opinion filed June 30, 1893.*]

1. LEGISLATIVE ACT—*Want of Power.*—So much of Art. 1, Chap. 3,. R. S. of Oklahoma, as provides for the collection, by an inspector, from the owner, vendor, or person in charge, of not more than three · cents for every head of horses, mules, or cattle, and not less than two · cents for each head of sheep leaving the county, and not more than five cents for each head of horses, mules, sheep, or cattle that shall enter the county, is void, as the legislature had no power to enact it.

2. NO CAUSE OF ACTION—*Judgment by Default.*—A complaint which states no cause of action will not support a judgment by default; and such judgment will be rendered in the appellate court. If the complaint states no cause of action, the objection is fatal at every stage of the proceedings.

*Appeal from the Probate Court of Beaver County. Reversed.*

*W. D. Matthews*, and *Gillette & Brown*, for appellant. . No attorney for appellee.

The opinion of the court was delivered by

DALE, J.:—This is an appeal from the probate court of Beaver county, for the purpose of setting aside a judgment rendered in that court against appellant in the sum of $182.48 and costs of suit.

The action was commenced below on the 30th day of August, 1892, and was brought under Art. 1, Chap. 3, of the Statutes of Oklahoma, entitled "An Act for the protection of stock raisers in certain localities."

There are but two questions presented in the appeal:

"*First.* Will an appeal lie from the lower court where a defendant files a demurrer to the complaint and refuses further to plead.

"*Second.* Is the law upon which this action is based such an act as the legislature had the power to pass . under the organic act of Oklahoma."

A reading of the transcript filed, discloses the fact that in the court below the appellant, then the defendant, appeared and filed a motion to dismiss because of want of service. The motion being overruled, and defendant required to plead, he then demurred, and as grounds of such demurrer alleged :

"*First.* That the court had no jurisdiction of the subject of the action.

"*Second.* Because the plaintiff's complaint did not state facts sufficient to constitute a cause of action."

The demurrer being overruled, the defendant duly excepting, and being required to further plead, refused. Whereupon judgment was rendered against him as provided in § 11, Act. 9, Chap. 70 Code of Civil Procedure. From such judgment defendant appealed upon questions of law. The plaintiff below filed in this court a motion to dismiss the appeal, for the reason that judgment was rendered upon default of answer. Appellant filed no motion for a new trial.

The motion to dismiss the appeal will not lie. The default admits the facts averred in the complaint to be true, but does not admit that such facts in law entitle the plaintiff to relief. If the facts thus admitted to be true do not authorize or require the relief, the court has no power to grant it. Plaintiff on default is not entitled to a judgment unless he, by his complaint, has shown a right of recovery. If, on looking through the record, the court is not satisfied that there are grounds for judgment the court should refuse judgment, notwithstanding the default. To entitle the plaintiff to recover, he must show a sufficient cause of action, and this is true whether there be a trial or default. The default confers no more rights than a finding of a jury. It will not be asserted that, if the facts found by a jury do not authorize a recovery, the court should enter judgment. In this case, the demurrer being filed to

the complaint, thereby calling in question its suffi-
ciency, it was the duty of the court below to refuse to
render judgment, if such complaint failed to state a
cause of action.

While numerous assignments of error are made, we
will consider but one, namely, the fourth, wherein it is
claimed that the court erred in overruling appellant's
demurrer to the complaint of appellee. The demurrer
brings in question the sufficiency of the complaint, and
if, upon an examination of the same, it is held insuffi-
cient, the judgment of the lower court must be
reversed.

Upon its face, the complaint recites the fact that A.
R. Henderson is the duly and lawfully qualified and
appointed inspector of hides and animals of Beaver
county, Oklahoma Territory. The defendant below,
M. J. Farris, is indebted to him in the sum of $182.48
for inspecting 2,281 head of cattle coming into Beaver
county, and going out of said county on June 30, 1892.
Demand for payment is alleged, and judgment prayed
for in the sum of $182.48 and costs of suit.

Upon the issue raised this court is called upon to say
whether or not the law upon which this action is based
is such an act as the legislature of this Territory had
the power to put into operation.

An examination of the law in question shows that it
took effect December 5, 1890. In its title it purports
to be an act for the protection of stock raisers in certain
localities. Section 1 provides that in sparsely settled
counties, where grazing is the principal business, and it
designates Beaver county as such a county, the gover-
nor shall appoint an inspector of hides and animals,
whose duty it shall be, in person or by deputy, to
inspect all hides or animals, known or reported to him
as leaving or going out of the county for sale or ship-

ment, and all animals driven into or sold in his county for slaughter or grazing. That the inspector shall keep a record in a well bound book, in which he shall record a correct statement of the number, ages, marks and brands of all animals inspected by . him, and the number, mark and brand of all hides inspected by him, and whether the same are green or dry, and the name or names of the vendor or vendors and the purchaser or purchasers thereof. Section 2 provides for the bond of the inspector. Sections 3, 4, 5 and 6 for inspecting stock about to leave the county, for the purpose of determining whether the party about to drive stock out has any which were not inspected at the time the stock was driven into the county. And if stock is found other than those inspected originally in the county from which the herd was driven, provision is made whereby the inspector may seize the stock and take them into his possession. Also to seize and sequestrate all unmarked or unbranded calves or yearlings and all calves and yearlings freshly marked and branded, which are about to be slaughtered or driven or shipped out of the county, ·unless such animals are accompanied by the mothers thereof, or are identified by bill of sale, from the person proved to be the owner thereof, signed by him or his legally authorized agent, and acknowledged before some officer authorized to authenticate instruments for record in this Territory.

Section 7 provides, that if the person in charge of unbranded animals or hides and animals. and hides upon which the mark or brand cannot be ascertained, which are about to be taken or shipped out of the county shall refuse to deliver the same to the inspector, such inspector may apply for and receive a writ of sequestration from any justice of the peace, probate or district judge according as the value of such stock may

come within the jurisdiction of either. Section 8 makes it the duty of the court having jurisdiction upon notification by the inspector of the fact that he has seized hides or animals to issue citations to the public that the seizure has been made, fully describing the property, and commanding any person who may be interested to appear and show cause, if any exist, why the property so seized should not be sold for the benefit of the county. In case the property is condemned to be sold the inspector shall retain one-fourth of the proceeds of such sale, the remainder to be paid to the county treasurer, and placed to the credit of the general fund of such county.

Section 10 reads as follows:

"Section 1 shall be so construed as to mean cattle, horses, mules and sheep, and to apply to all of the same which may be driven into or passing through the county, either for grazing or for any purpose whatever."

Section 11 reads:

"The inspector shall collect as fees from the owner, vendor or person in charge, not more than three cents for each and every head of horses, mules or cattle leaving the county, and not less than two cents for each head of sheep. And for each head of horses, mules, sheep or cattle, which may enter the county, he shall collect as fees not more than five cents per head, and for each and every hide inspected he shall collect as fees not more than five cents."

Sections 12 and 13 provide that the owners or persons in charge of any stock about to enter or leave the county shall notify the inspector of the fact. And if they fail to so notify the inspector, they shall be punished by fines of not less than five hundred or more than one thousand dollars.

Sections 14 and 15 make it mandatory upon any persons who drive stock into the county to notify the inspector of that fact, and until the stock is inspected, they must not be moved a greater distance than one

mile per day. And upon a failure to so notify the inspector, or if after entry into the county they shall move their stock more than one mile per day, they shall be fined not less than two hundred nor more than five hundred dollars.

While the foregoing does not fully set forth all the provisions of the act under which the suit is brought, yet enough is shown to convey a correct idea of the purpose, scope and character of the same. The action having been predicated upon this special act of the legislature, and judgment rendered in accordance with its provisions, we are called upon to determine whether or not the law is one within the power of the legislature to enact.

The legislature receives its grant of power from congress, as set forth in the organic act of this Territory. If it has the right to enact such legislation as the law under consideration it must be found expressed or inferred in the act of congress creating this Territory. In order to correctly determine the question, it is necessary to ascertain, the purpose of the legislature in passing the law, the extent to which the law is applicable, and whether or not the law is of that character authorized by our organic act.

While the law purports to be an act for the protection of stock raisers in certain localities, its text discloses the fact that Beaver is the only county designated wherein the law shall become operative. It is true that § 1 states, that in sparsely settled counties, and in counties where grazing is the principal business, there shall be appointed an inspector, but it makes no provision whatever for determining which counties are sparsely settled, or in which grazing is the principal business. It names Beaver as such a county and fails to make mention of any other. Unless such fact as

would entitle the county to the benefit of the law, be first determined by some competent authority, the law cannot be said to be in force in any county except the one named in the act. In the absence of legislative action we must therefore conclude, that the law as passed, intended to apply only to Beaver county, as that was the only county named in the act, and as no provision whatever was made for putting the law in force in any other county.

At the date of the passage of the law in question Beaver county consisted of a strip of land about thirty-five miles in width, and commencing at the northwest portion of the Cherokee Outlet it extended west between the south line of Kansas and Colorado, and the north line of what is commonly called the Panhandle of Texas, a distance of about 160 miles, and to the east boundary line of New Mexico. The country lying to the north and south of Beaver county, as well as such county, is mostly used for grazing purposes. It is a well known fact that each year large herds of cattle are driven north from Texas into and through Beaver county, for the purpose of being grazed upon the grasses of that county, and for the further purpose of reaching convenient shipping points on the railways which run through the southern and western part of the state of Kansas. By reason of its great length and its location the owners of cattle from Texas who drive north to graze and market their stock, are compelled to pass through Beaver county. Much inconvenience and expense would result were they obliged to drive around its boundary lines.

In the passage of the law the legislature evidently had two purposes in view. *First.* To keep the cattle from the south out of Beaver county, and thereby save the grass for the stock of the settlers of such county.

*Second.* To prevent persons who might drive cattle through that county from gathering into their herds stock owned by persons living therein. To effect the desired purpose, the legislature provided for the levying of a heavy tax upon all stock passing through the county, doubtless with the idea in view that such tax would keep out of that county many cattle which would otherwise be grazed there, and also provided that the hides and animals should be inspected when they entered as well as when they left the county. By such inspection preventing without being detected, herds passing through, from being increased in numbers while in the county. In short, the whole aim and intent of the legislature, in passing the act under consideration, as we gather from a consideration of the law, was to assist the settlers in Beaver county in protecting tne grass which grows in that county from being grazed upon by stock owned by persons not residing therein, and to prevent those driving stock through that county from taking out of that county stock owned by persons living there.

To accomplish such a purpose. the legislature invoked the taxing power of our Territory. And not satisfied with that, gave to inspectors the power to sequester property, and upon the refusal of the person in charge of the stock to promptly deliver such stock to the inspector upon demand, made it incumbent upon the courts to issue a peremptory writ of sequestration, whereby the stock might be forcibly taken from the owner. And still to make more certain that the purpose of tne legislature would be accomplished, the criminal law was invoked, and very heavy penalties, by fines, were imposed upon all persons who, upon crossing the boundary lines of that county, with stock, failed from any cause to promptly notify the inspector of such fact.

In examining the law relating to the subject under consideration, we find that § 6 of the organic act provides that,

"The legislative power of the Territory shall extend to all rightful subjects of legislation, not inconsistent with the constitution and laws of the United States. But no law shall be passed interfering with the primary disposal of the soil. No tax shall be imposed upon the property of the United States, nor shall the lands or other property of non-residents be taxed higher than the property of residents, nor shall any law be passed impairing the right to private property, nor shall any unequal discrimination be made in taxing different kinds of property, but all property subject to taxation shall be taxed in proportion to its value. Provided: That nothing herein shall be held to prohibit the levying and collecting license or special taxes in the Territory from persons engaged in any business therein, if the legislative power shall consider such taxes necessary."

If the legislature has the power to enact the legislation embodied in the law under consideration, it must be found in that part of the organic act set forth above. We find no such grant of power. On the contrary, we find in that language which reads as follows: "Nor shall the lands or other property of non-residents be taxed higher than the lands or other property of the residents," an implied, if not an express prohibition against the levying the special tax of eight cents per head upon all stock *driven into* and *out* of Beaver county. Under the operation of this law non-residents who drive stock through Beaver county are taxed eight cents per head, while those owning stock in Beaver county escape such tax. The effect of the law is to tax the property of non-residents higher than of residents. And it is wholly immaterial so far as it affects the person who pays the taxes whether they are levied in the form of inspection fees or whether they go into the treasury

of the county for the benefit of the public. The purpose of the clause in the organic act is to protect property from taxation as well as to create a fund for public purposes.

There is another feature of this law which we deem it best to consider at this time. The third clause of Art. I, § 8 of the constitution of the United States reads as follows:

"Congress shall have the power to regulate commerce with foreign nations, and among the several states, and with the Indian tribes."

In that clause we find that the right to regulate commerce between states has been expressly delegated to congress. The law in question is an unauthorized interference with commerce between states.

The right of a state or territory to legislate for the purpose of protection against disease, to make necessary police regulations, or to enact inspection laws which have for their purpose the general good of a state or the public, and which operate upon all alike, is unquestioned. But such right does not carry with it the power to collect tolls upon the commerce of a sister state while such commerce is in transit through a a state. In the case of *State Freight Tax*, 15 Wall, 232, Mr. Justice Strong, upon the question of taxes upon freight transported from state to state, used the following language:

"Beyond all question, the transportation of freight, or of the subjects of commerce, for the purpose of exchange or sale is a constituent of commerce itself. This has never been doubted, and probably the transportation of articles of trade from one state to another was the prominent idea in the minds of the framers of the constitution, when to congress was committed the power to regulate commerce among the several states. A power to prevent embarrassing restrictions by any state was the thing desired. Nor does it make any

difference whether this interchange of commodities is by land or water.   In either case the bringing of goods from the seller. to the buyer is commerce among the states.  It must have been principally by land when the constitution was adoped."

The driving of stock from the south through Beaver or other counties of Oklahoma to the markets on the north of this Territory, is the same kind of commerce in vogue between states, at the time the right to regulate the same was by the states expressly delegated to congress.   The same reasons which then existed for taking the power from the states to prevent states from imposing vexatious restrictions upon commerce between states, prevails at the present time.

If the necessity exists for the exercise of the power of regulating commerce between states, congress alone has the power to act in the matter.   The driving of cattle or other stock from the breeding grounds of Texas across this Territory to the northern states, for the purpose of grazing and marketing them is in its. nature national commerce, and will admit of no uniform system of regulation.   Such being the case congress alone has the power to put into operation a plan which will be uniform in its operation and act upon all alike.   Upon this proposition we again quote from the opinion last cited:

"Surely merchandise through a state or from one state to another is of this nature.   It is of national importance that over that subject there should be but one regulating power.   For if a state can directly tax persons or property passing through it, or tax them indirectly by levying a tax upon their transportation, every other may, and thus commercial intercourse between states remote from each other be destroyed. The produce of western states may thus be effectually excluded from the eastern markets, for though it might bear the imposition of a single tax, it would be crushed under a load of many.   It was to guard against the

possibility of such commercial embarrassments, no doubt, that the power to regulate commerce among the states was conferred upon the Federal government."

If Beaver county has the right to levy the tribute of eight cents per head on each head of stock passing through that county, all other counties in Oklahoma may with equal propriety exact the same amount. It would only be necessary for the legislature or some other power to declare them sparsely settled, or to affirm that grazing is their principal business, and they would be empowered to exact toll from all live stock passing through such county. Such a state of affairs would prove highly vexatious, and an attempt to regulate the commerce of the states as it passed through the several counties of our Territory, and contrary to the principles of comity which should exist between states.

The law upon which the action in the court below was based is void because the legislature had no power to enact such a measure. The demurrer to the complaint filed should have been sustained.

The judgment of the probate court is reversed.

All the other justices concuring.